IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

MATTHEW JASON BEDDINGFIELD

Case No:  22-mj-00020-RMM

## I.   MOTION TO RELEASE MATTHEW BEDDINGFIELD UNDER THE BAIL REFORM ACT

Matthew Beddingfield, by his attorney, Kyana Givens, respectfully requests that this Court release him on bond pursuant to the Bail Reform Act ("BRA"), 18 U.S.C. § 3142 and United States v. Salerno, 481 U.S. 739 (1987).  Among the many effective conditions this court can impose, he requests a combination of conditions including but not limited to: 1) Release to a Third-Party Custodian, 2) GPS monitoring, 3) Travel and Internet restrictions, and any substance abuse or mental health treatment the USPO pretrial service shows is necessary after evaluations.

## II.   INTRODUCTION

Matthew Beddingfield is a 21 year old citizen of the United States. He has lived in the Johnston County area of North Carolina all of his life along with many of his family members. He earned a high school diploma in 2018 from Corinth Holders HS in Wendell, NC.  After high school he continued to live with his father, mother and younger brother.  He maintained employment and contributed to the household.  Before the instant arrest, Matthew was residing in Middlesex, North Carolina.  Under the Constitution, he is presented before this court as an innocent young man with a presumption of release under the Bail Reform Act, §3142.

Most of the government's ink is devoted to Matthew's protected speech and equally protected literature. Government's Detention Motion - DE 10 pp. 6-11, 16, 18.  Another couple pages

are devoted to general template language describing the 2020 Presidential Election and an overview about the Capitol Breach on January 6th that to date applies to over 700 defendants and countless uncharged people. What is missing from that background is the obvious responsibility void toward those that created, planned, stirred and enabled the environment that birthed the January 6th Capitol Breach. It is troubling to demand more from a still-developing young person who was not the creator, leader, or organizer of the propaganda that resulted in violence that day. Matthew was not even a member of a subgroup like: The Proud Boys, The Oath Keepers, or a Militia. His dad brought him to D.C. to witness a historical outcome, they did not know what would happen.

In the United States, citizens should not be detained derived consciously or unconsciously from biases-especially when the government's judgment about the liberty of the accused is clouded by "vile" viewpoints. DE. 10 pp. 8. Equally unavailing is the government's wide and legally perilous leap between objectionable viewpoints, speech, and gestures leading to criminal acts if Matthew is released. As presented, it looks like the government attempts to link speech to dangerousness, to create an unconstitutional bias in the eyes of this court to encourage detention. Matthew requests that this court carefully weigh the BRA standards and impose a combination of conditions for release to ameliorate concerns about Matthew's risk of flight or safety risk to the community. §3142(c). This court has over 30 effective conditions to work with that will meet the needs of Matthew Beddingfield. The United States Probation Office is sufficiently resourced and retains a combination of skilled personnel and community based partnerships to properly supervise this developing young adult.

III.    **BACKGROUND & PROCEDURAL HISTORY**

On February 8, 2022, Matthew Beddingfield was arrested on a complaint alleging charges arising out of the events on January 6, 2021. *See* Docket Entry 01. On February 9, 2022, in Raleigh, NC, he appeared for his Initial Appearance under Federal Criminal Rule 5. He was temporarily

detained by the local Magistrate Judge until his Rule 5 transfer to the District of Columbia.   On

February 22, 2022 undersigned counsel entered a Notice of Appearance to represent him in D.C.

District Court. Docket Entry 07.   Matthew is now housed at Northern Neck Regional Jail.

The government argues that Matthew presents a danger to the community based on (1) nature

of the instant allegations; (2) a heightened evaluation of dangerousness linked to protected online

speech; (3) the "strength of the evidence"; (4) his criminal history; and (5) an unsupported conclusion

that no combination of conditions will address any risk of flight and safety to the community.

Undersigned counsel proposes a good release plan including a Third-Party custodian.   At the time

the D.C. Pre-trial Report was filed, Pre-trial services relied on his mother as the Third-Party

custodian and raised concerns about the firearms and ammunition found in the family home. Docket

Entry 08.   Counsel was not yet appointed and changed the Third-party custodian to his grandfather.

Although the government moved for detention based on danger to the community and risk of

flight, it offered no evidence or argument that he poses a risk of nonappearance.   Matthew is not a

flight risk.   Ironically, Matthew was arrested while following his conditions of probation at the State

level.   He went to a regularly scheduled visit at his State probation officer's public safety location

and he was arrested at that office by US Marshals.

The government also argues against release because of Matthew's performance on State bail

and probation.   In both orders, there were very few conditions imposed and virtually no mechanism

to monitor and enforce compliance.[1]   Federal pre-trial release has more rigor, resources and

conditions to effectively supervise Matthew than the supervision he was receiving in Johnston

County.   His State requirements at the bail and probation stage of his prior case had minimal

---

[1] His probation conditions indicate he is to refrain from drugs and alcohol. However the D.C. Pretrial Report indicates
he wasn't tested to enforce this provision in over 30 days.  Dkt. 8, pp. 2.

requirements.  Significant differences in our release recommendations adds GPS monitoring, residing in a home in a rural area, and he will not have internet access.  Federal Pre-trial services also has the ability to conduct pre-trial mental health and substance abuse evaluations to ascertain and give informed recommendations if treatment needs are indicated.  Pre-trial incarceration does not effectively apply rehabilitative services the way community programs can.  For our youngest accused, like Matthew, this court should put great weight on inundating him with services to reduce the risk of future recidivism.  A community based plan is good for him and good for the community long-term.

## IV.    MATTHEW'S CRIMINAL HISTORY CONSISTS OF ONE PRIOR FELONY AND HE DID NOT VIOLATE ANY BAIL OR PROBATION CONDITIONS BY GOING TO D.C. WITH HIS FATHER

Matthew has one prior felony conviction.  Repeatedly media articles say Matthew was in D.C. while released on an Attempted Murder charges.  Matthew's prior case is sensationalized and attempts to cast him as extremely dangerous.  The government also described his bail and probation status with an imprecise description.  Matthew had every right to attend the events scheduled in Washington, D.C. on January 6, 2021.  Matthew's prior offense occurred December 13, 2019. Matthew was released on a State secured bond on January 2, 2020. Exhibit 1.  His release was over a year before the Capital Breach. The state prosecutor and his prior defense counsel negotiated a resolution on lesser charges.  As a result, Matthew's bond was exponentially reduced from $1 Million to $100,000.  On January 2, 2020, Matthew bonded out of county jail and none of his conditions prohibited his travel whatsoever. *Id*.  Matthew went to Washington, D.C. lawfully.  The media had his procedural status wrong and to this day, the government has not expressed a full-throated correction.  Their memo clearly indicates the government has the conditions.  Docket Entry 10, pp. 5 fn.1.

In addition to being free to travel, Matthew's State bail and bond conditions did not even require his parents to remove their firearms from their home.  North Carolina has pride in gun ownership and many households have more than one.  In April 2020, the RAND Corporation published a long-term study tracking gun ownership in all 50 states, from 1980 to 2016.  *See* *https://www.rand.org/pubs/tools/TL354.html* at pp. 37 (online pdf last visited 3/3/2022).  45.8% of North Carolinians owned registered guns.  *Id*.  Montana ranked the highest at 66.3%. *Id.* at Figure 2.  It is common, particularly in rural counties for State release conditions to show some deference to adult gun ownership.  Matthew's first release conditions only required, "…def is not to have any <u>access</u> to any guns in the home either". *See* Exhibit 1.  His parents hid and secured their firearms from their kids in various locations.  They dispute the government's statements that Matthew had "thousands of rounds of .22 ammunition in his bedroom". Docket Entry 10, pp. 12.  The FBI executed a search warrant at Matthew's parent's home.  His parents have maintained a long standing rule that neither Matthew, nor his sibling is allowed in their parent's bedroom where guns are secured.  His parents owned the guns and hid, secured, and locked them in the home and in a barn.  Although the search warrant does not say where the guns were found in the home, the inventory receipt lists the weapons and the seized ammunition. *See* Exhibit 2.  There is nowhere near "thousands of rounds of .22 caliber ammunition" listed like the government asserts. *Id*.  The inventory receipt indicates there were 45 rounds of ammunition and 8 weapons listed in the FBI inventory receipt.  *See* Exhibit 2.  If there is evidence additional rounds, we simply have not seen it yet.  Regardless, our release conditions recommendation does not include him returning home.

Matthew remained on bail at his parent's home for the remainder of his case.  On August 16, 2021 he entered an *Alford Plea* to Possession of a Dangerous Weapon with Intent to Inflict Serious Bodily Injury.  *See* Exhibit 3. pp. 7 & 9.  The Attempted First Degree Murder originally

charged was dismissed by the State Government.

### A. The Alford Plea is Significant to how Matthew's Criminal History is Interpreted.

It is not the province of this court to re-litigate the integrity of Matthew's 2019 State court charges or his *Alford Plea*. *See* North Carolina v. Alford 400 U.S. 25 (1970). Through effective assistance of counsel, a resolution was reached related to conduct when Matthew Beddingfield was still a teenager. Matthew's father asserts his son was being robbed by another individual before the shooting occurred. Whatever the State government's justification for reducing the charges, the seriousness of the offense must be interpreted through the disposition that followed: Matthew's bail was reduced, he was released, he later entered an *Alford Plea (also known as a Best Interest Plea[2])* to lesser State charges, and he received credit for time served, a 24-month suspended sentence and probation. *See* Exhibit 3. There is no place for the Federal Government to do a post-conviction reassessment and prescribe more weight to his prior charge than the record reflects-especially in an *Alford Plea*. The perceived dangerousness of Matthew as it relates to his criminal history is reflected in his final judgment. Despite many prescribed options to his State Judge, Matthew's Judgment imposed minimal probation requirements. *Id* at pp. 2-4.

It is legally significant that Matthew entered an *Alford Plea*. The government wholly ignored the nature of Matthew's plea and actual admissions in its arguments about his prior crime and dangerousness. The "facts" that can be extrapolated from an *Alford Plea* have limits. *Alford Pleas* are distinct because it allows someone to enter a plea of guilt and the court to rely on the factual basis to enter the plea, without the accused accepting and/or agreeing with the proffer of "facts" offered by the government. In U.S. v. Ventura[3] the court makes this point clear:

---

[2] Matthew's Plea Transcript specifically notes his intention to enter an *Alford* plea because it was in his "best interest". Ex. Judgment pp. 7, par. 14.
[3] Similar to *Alford*, the *Ventura* defendant entered a plea of nolo contendere. *The* fact that his plea was denominated a

The government maintains that the pleading defendant admits the truth of any facts alleged by the prosecution. But this argument misconstrues the effect of a nolo plea under Virginia law. In Virginia, a defendant who pleads nolo contendere admits only the truth of the charge--that is, the crime charged in the indictment. See Commonwealth v. Jackson, 255 Va. 552, 499 S.E.2d 276, 278 (Va. 1998)

Rather, his counsel confirmed that by pleading nolo contendere Ventura signaled only that he was "not contesting the charge." Tr. of Plea Colloquy at 16, Hernandez-Chacon, No. 98623. And the judge found Ventura "guilty as charged in the indictment." Id. at 17 (emphasis added). At no point did Ventura, his counsel, or the judge confirm the truth of the facts as stated by the Commonwealth in its proffer. The judge was not required to accept those facts to convict Ventura.

*United States v. Ventura*, 565 F.3d 870, 878-79 (D.C. Cir. 2009).

Likewise, the record here does not permit this Court to say with the requisite certainty that Matthew is guilty of the "facts" proffered by the government (State or Federal).  Rather, Matthew's plea only represents consent to the elements of the lesser charge.  Assuming Matthew understood the legal and factual threshold for his prior charges, his State Plea colloquy indicates it was nevertheless in his best interests to plead guilty regardless of his reasons.  *See* Exhibit 3 at pp. 6, par. 14.  We don't know if he entered an Alford Plea because, "the State's case against him [i]s so strong that he w[ill] … be [] convicted anyway." *Henderson v. Morgan*, 426 U.S. 637, 648 n.1  (1976); *See also Alford* (permitting defendant to enter a guilty plea "because in his view he had absolutely nothing to gain by a trial and much to gain by pleading,").  All this court can do is interpret the North Carolina State court's acceptance of Matthew's *Alford Plea* as a rational decision that a guilty plea was in his best interests for valid reasons.  He was entitled to, "make[] a conscious choice to plea to avoid the expenses or vicissitudes of trial," *United States v. Vonn,* 535 U.S. 55, 69 n.8 (2002).

Whether in the context of an *Alford Plea* or otherwise, if there is a "factual basis for the plea," *Alford,* 400 U.S. at 38 n.10, the defendant should not be denied "the opportunity to act in his own

plea of guilty rather than a plea of nolo contendere is of no constitutional significance with respect to the issue now before us, for the Constitution is concerned with the practical consequences, not the formal categorizations, of state law. See *Alford*, 400 U.S. at 37.

best interest [in pleading guilty], *as advised by his trial counsel*," *United States v. Gaskins,* 485 F.2d 1046, 1049 (D.C. Cir. 1973) (emphasis added).  The Supreme Court has made clear that the defendant "must be permitted to judge for himself in this respect." *Alford,* 400 U.S. at 33 (internal quotation marks omitted).  This autonomy does not now allow the Federal government to speculate about Matthews reasons for entering an *Alford Plea*; or to extrapolate some inflated dangerousness from "facts" that he did not endorse.

### V.  THE STANDARD OF REVIEW FOR DETENTION FAVORS THE ACCUSED

As the Supreme Court held in *United States v. Salerno*, 481 U.S. 739 (1987), "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *Id.* at 755. This presumption of release is encapsulated in the BRA, 18 U.S.C. § 3142. The statute states that the Court "shall order" pretrial release, § 3142(b), except in certain narrow circumstances. Even if the Court determines under § 3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further conditions" that will "*reasonably assure*" the defendant's appearance in court and the safety of the community. § 3142(c)(1) (emphasis added). It is important to note that, "Section 3142 speaks only of conditions that will "reasonably" assure appearance, not guarantee it". *United States v. Xulum*, 84 F.3d 441, 443 (D.C. Cir. 1996)(per curiam).  Under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at  7  (1984), *as  reprinted in*  1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention.").

A judicial officer is not permitted to impose any financial conditions of release which result in pretrial detention. 18 U.S.C. § 3142(c)(2). The conditions of release imposed on a defendant under a Section 3142(c) order may be amended at any time to impose additional or different conditions of

release. 18 U.S.C. § 3142(c)(3).  This court not only has more than 30 different Standard and Special conditions to utilize, this court has the authority to justify unique conditions and stay engaged with the needs of the accused.  Matthew agrees to comply with the standard and special conditions imposed by this court.

In determining whether there are conditions of release that will reasonably assure the appearance of the defendant at trial and the safety of any other person and the community, the Court must consider the factors set forth in 18 U.S.C. § 3142(g). It is the government's burden to establish that a defendant is a risk of flight by a preponderance of the evidence, and it must show that a defendant is a danger to another person or the community by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Stewart,* 19 F. App'x 46, 48 (4th Cir. 2001), *see also United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989).  There is no 18 U.S.C. § 3142(e), presumption in favor of detention here and the defendant should be released unless the government establishes by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community, or, by a preponderance of the evidence, that no condition or combinations of conditions will reasonably assure the appearance of the defendant as required. See 18 U.S.C. § 3142 (e-f). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). In assessing whether pretrial detention is warranted for dangerousness, the district court considers four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142 (g)(1)-(4).

"Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety." *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021). Before this court may detain an individual, the court must "identify an articulable threat posed by the defendant to an individual or the community". "Detention cannot be based on a finding that the defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness." *Id*.

Only in the "rare circumstances should release be denied," and any "doubts regarding the propriety of release should be resolved in the defendant's favor." *United States v. Gebro*, 948 F.2d 118, 1121 (9th Cir. 1991). The Bail Reform Act requires the Court to impose the "least restrictive" means of ensuring the appearance of the person and safety to the community. 18 U.S.C. §3142 (c)(1)(B).

## VI.   **ARGUMENT**

### A. **Neither Weight of the Evidence nor Potential Penalty Justifies Detention in this Case.**

The government argues the weight of the evidence and potential penalty to justify detention. Dkt 10 at pp. 15 (weight of evidence) & pp. 17 ("lengthy incarceration"). Neither of these considerations should be given much weight in this case. ("The weight of the evidence against the defendant is a factor to be considered but it is 'the least important' of the various factors."); *United States v. Gray,* 651 F. Supp. 432, 436 (W.D. Ark. 1987) ("[T]he court does not believe that . . . any court should presume that every person charged is likely to flee simply because the evidence against him appears to be weighty. . . . Such a presumption would appear to be tantamount to a presumption of guilt, a presumption that our system simply does not allow.").

Likewise the potential penalty in this case is not a legitimate basis for detention. Dkt. 10 at 17.  There is no evidence Congress intended courts to de facto detain any client facing a long prison sentence. Indeed, many federal defendants face long sentences—being a defendant in a run-of-the-mill federal case cannot possibly be an "extreme and unusual circumstance." Even at the detention hearing, where the standard for finding risk of flight is lower, Congress did not authorize courts to evaluate potential penalty when considering risk of flight. *See* § 3142(g), See Also *Friedman*, 837 F.2d at 50 (in "cases concerning risk of flight, we have required *more* than evidence of the commission of a serious crime and the fact of a potentially long sentence to support finding risk of flight") (emphasis added).

### B.  To Accord with Due Process, The Government's Dangerousness Arguments about Matthew must be Anchored to Constitutional Principles.

The U.S. Supreme Court in *Reno v. ACLU* (1997) noted that the Internet is entitled to the highest level of First Amendment protection, akin to the print medium.  Online hate speech receives as much protection as a hate-speech pamphlet distributed by the Ku Klux Klan.  Free Speech is curtailed in limited circumstances.  Relevant limitations on Free Speech include incitement to imminent lawless action and expressing a "True Threat".  *See Brandenburg v. Ohio*, 395 U.S. 444 (1969) (Incitement to Imminent Lawless Action) and *Virginia v. Black*, 538 US 343 (2003) (The True Threat Doctrine).

> "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect(s) individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur."

*Virginia v. Black*, 538 U.S. 343-344 (2003).

The Supreme Court specifically analyzed social media posts to determine whether speech online could constitute a threat.  *See Elonis v. United States,* 575 U.S. 723 (2015)*.* The case involved

an individual that posted rap lyrics on Facebook to threatened to kill his ex-wife. He was charged for conveying threats across state lines. The Supreme Court case determined whether a post on social media crossed into the realm of the "True Threat" standard. The Court chose to apply a "reasonable person" standard, to decide whether the post was an intended threat and a reasonable person would perceive the post as a threat. The Supreme Court ruled the rap lyrics, even toward a specific target, was not a "true threat" from the reasonable person standard.

The government has centered Matthew's viewpoints to bolster their argument that Matthew is dangerous. *See* Docket Entry 10 pp. 6-11, 16, 18. Of the governments seven pages devoted to Matthew's political viewpoints and speech, only a few lines mention his First Amendment Right to Free Speech. Docket Entry. 10 at pp. 8. Putting Matthew's online speech and literature front and center in the government's detention argument makes the passing acknowledgment of his First Amendment Rights ring hollow instead of the firewall it is. This court's release determination can't be linked to the "vile" speech listed in the government's brief. Even if this court is compelled to give weight to Instagram posts attributed to Matthew, none appear to manifest the requisite imminence or true threat standards. Likewise, Matthew's viewpoints don't amount to a general threat to the community worthy of pre-trial detention.

## C. Matthew poses no articulable concrete threat to a prospective individual or the community.

The government argues Matthew should be detained because of his prior criminal history and the alleged conduct on January 6, 2021. It is anticipated the government will point to screen shots and videos showing an individual they believe to be Matthew at the Capitol: breaching the west plaza barrier, jabbing toward an officer, inside the Rotunda marching around, in a Hallway and ultimately peacefully exiting the Capitol after being directed to do so by Capitol Police.

This alleged conduct does not rise to the level of conduct in cases where the defendant has

been detained, and defendants facing far more serious allegations have been released. In *United States v. Mark Leffingwell*, 1:21-cr-005, the defendant was released after he pushed past a wall of officers and repeatedly punched an officer with a closed fist.   Despite the direct physical contact with his bare fists, Mr. Leffingwell was released.

The government alleges that Matthew used "a dangerous weapon" to commit alleged crimes that day.   First, the alleged "dangerous weapon" was a flag pole with a flag attached.   The government indicates Matthew brought this flag with him to the Capitol.   In most of the government's exhibits, Matthew is holding his flag using it appropriately.   Waiving it with and among the crowd.   Later, even after entering the Capitol, Matthew is waving the flag and marching around the Capitol Rotunda.   Unlike many others, he was not recklessly destroying property or taking "souvenirs".

All the dangerous weapons allegedly used by people on January 6, 2021 are not created equal. People have been assigned a range of items and this court should consider the spectrum of weapons on a case-by-case basis rather than assigning a heightened sense of danger because of the date, location, and the profession of the victim.   For Matthew it is paramount to consider:  1) His age—a youthful offender; 2) This is his first federal offense and he will be adjudicated as such; 3) he was accompanied by a parent to the capitol that day; 4) he had a flag on a pole and had done so peacefully in the past.   By the government's own admission and media pictures, he has brought a flag on a pole to previous political rallies, peacefully, and accompanied by his father. Docket Entry 10 at pp. 9, fn. 7.   His peaceful presence at a political rally with a flag pole undermines the government's argument that if he encounters opposing beliefs he will engage in violent acts.   Even when "counter protesters" acted up at the November 2020 rally, Matthew did not seek confrontation or engage in violence.

On January 6, 2021, Matthew was engaged in aberrant acts during the mayhem of mob

mentality. There is no evidence he came to the rally with the intention of using his flag to do harm or possessed a premeditated intent to harm others. Matthew can be prevented from attending political rallies and put on GPS location monitoring to ensure the court's order is enforced.

More importantly, this court should view its pretrial detention determination through comparative rhetoric and actions from that day. Big picture, a former President and current members of congress were engaged in a campaign of conspiracy theories that provoked believing citizens into action on January 6, 2021. Specifically, on January 6, 2021, those same people stirred its believing crowds into a frenzy and then encouraged the crowd to confront Congress while in session in the Capitol building. First, the people with the most power and campaign of equally serious rhetoric, remain free. It is unjust for the government to try and detain an impressionable young person as if he were the leader, organizer, or among the most dangerous of the January 6th detainees.

This court has released people engaged in more serious activity than Matthew and far more entrenched and "dangerous" than Matthew. Some media outlets report 85% of January 6th defendants have been released and only a few have violated release. https://slate.com/news-and-politics/2022/01/jan-6-capitol-riot-criminal-prosecutions-status.html (last visited March 3, 2022). Matthew should also be released.

In its arguments for detention, the government paints too broad a brush by arguing for pretrial prison for people like Matthew whom are young, lacked a "leadership" role, and characterized his previous flag pole waiving as (now) a dangerous weapon. Matthew does not have a pattern of violence. Even by the government's own account, Matthew was alleged to have been at a rally in November 2020 and he is depicted waiving a flag and attending peacefully. A few months later it was different, but the whole occasion was different. Those two events don't create a pattern to assert he is dangerous to the community if released. Plus his conditions can limit where he goes. Matthew

was not a part of the Proud Boys, the Oath Keepers, or any other identified organization. There is no evidence Matthew attended January 6, 2021 knowing, anticipating, or even hoping for the type of mayhem that ensued.   The government's energy is misplaced on influenced young people like Matthew.  Our Democracy is ripe with diverse rhetoric. It was extremely unique that Political dissent boiled over on January 6, 2021.  Matthew was not even close to having engaged in the most serious conduct that day.  His conditions will avoid any future occurrences and he should not be imprisoned while the case proceeds.

Even the carrying of pocketknife, a Taser and zip ties while making way into the Senate Gallery, is insufficient to detain a person. *United States v. See Munchel* Order at pg. 5. In reversing the district court, the Circuit noted that possessions of instrumentalities did not translate to risk to the community.  *Id. at 18.   United States v. Chad Jones*, 1:21-mj-076, also supports release. Mr. Jones is charged with assault on a police officer with the use of a deadly or dangerous weapon (a flagpole) and accused of repeatedly striking and breaking the glass of the doorway where Ashley Babbitt was shot and killed. *The government did not seek Mr. Jones's detention and Magistrate Judge Harvey released him on special conditions.*  Mr. Vitali (*United States v. Vitali Gossjankowski*, 1:21-cr-123), is accused of assaulting a federal officer with a Taser and giving the officer a heart attack after being "Tased" multiple times in the neck. Here too, the government consented to release.

As of January 2022, an estimated 160 January 6 defendants prosecuted in district court were granted pretrial release.  There is not actually a hard line between those that assaulted police and those that did not.  There are several January 6, 2021 Defendants charged with violent acts that have pre-trial release orders.  A check of CM/ECF confirms that many were released even after weapons (sometimes collections of them) were found in their homes:

**Released--Gregory Nix,** 1:21-cr-00678-BAH (allegedly attacked one officer with a flagpole seven times.

| 1/23/2021 | 10 | ORDER Setting Conditions of Bond : Defendant GREGORY LAMAR NIX placed on Personal Recognizance Bond in the High Intensity Supervision Program, with Home Detention utilizing GPS; signed by Magistrate Judge Robin M. Meriweather on 11/23/2021. (Attachment: # 1 Appearance Bond) (kk) (Entered: 11/27/2021) |

**Released--Paul Rae**, 1:21-cr-00378-TJK-2(alleged Proud Boy, violated pre-trial release and was given another chance)

| 03/31/2021 | 12 | ORDER Setting Conditions of Release as to PAUL RAE (1) Personal Recognizance. Signed by Magistrate Judge Zia M. Faruqui on 3/31/2021. # 1 Appearance Bond) (ztl). [1:21-mj-00330-GMH] (Entered: 05/11/2021) |

**Released--Bryan Betancur**, 1:21-cr-00051-TJK-1(alleged "avowed white supremacist" and was on GPS monitoring when he attended January 6th.)

| 02/01/2021 | 7 | ORDER Setting Conditions of Release as to BRYAN BETANCUR (1) Released. Signed by Magistrate Judge Zia M. Faruqui on 2/1/2021. (Attachment 1: Appearance Bond) (Entered: 02/01/2021) |

**Released-Luke Coffee** 1:21-cr-00327-RC (Actor and alleged attach on officer using a crutch)

| 04/09/2021 | 18 | ORDER Setting Conditions of Release with Global Positioning System Monitoring. Signed by Chief Judge Beryl A. Howell on 4/9/2021. (Attachments: # 1 Appearance Bond) (ztg) [1:21-mj-00236-GMH] (Entered: 04/09/2021) |

**Released-Robert Sanford**, 1:21-cr-00086-PLF (retired firefighter alleged to have thrown a fire extinguisher at police during a mob assault)

| 03/03/2021 | 11 | ORDER Setting Conditions of Release with Global Positioning System Monitoring as to defendant Robert Sanford. (Signed by Judge Paul L. Friedman on 3/3/2021). (tj) (Entered: 03/03/2021) |

**Released-Michael Joseph Foy,** 1:21-cr-00108-TSC (allegedly wrapped a Trump flag around a hockey stick and attacked police)

| 4/29/2021 | <u>22</u> | MOTION for Release from Custody by MICHAEL JOSEPH FOY. (Attachments: # <u>1</u> Text of Proposed Order)(Ohm, Eugene) (Entered: 04/29/2021) |
|---|---|---|
| 07/02/2021 | <u>45</u> | ORDER: Granting <u>22</u> Motion for Release from Custody as to MICHAEL JOSEPH FOY (1). Signed by Judge Tanya S. Chutkan on 07/02/2021. (tb) (Entered: 07/02/2021) |

All of the men above received pretrial release and allegedly assaulted police with deadly weapons. Matthew is a young man whom can be effectively supervised in the community. He is not a dangerous threat to the community requiring pre-trial detention. He was not a leader, organizer, working in concert with others. At January 6, 2021, he did not have a gun, taser, a knife taped to his flag pole, an ax handle, pepper spray, bear spray, or anything else that can be interpreted that this youngman attended the rally with anything more than interest and political speech in mind. He did anticipate the level mayhem.

The government did not prove by clear and convincing evidence that no conditions could be set to protect the community. In fact, the evidence is to the contrary. Even his latest pretrial services report states, "PSA spoke with the defendant's probation officer Tiffany Sanders whom reported that prior to the defendant's arrest he was compliant with his conditions of release set forth by the court." *Id* at Docket Entry 8, pp. 4. Here in federal court we have even more resources to supervise Matthew and mechanisms to hold him accountable to them.

   i. **Two viable Third-Party Custodians Plus additional conditions of release will reasonably assure the safety of the community.**

Despite one prior felony crime and a pending driving charge, Matthew does not pose a serious threat to the community. As the Circuit court in *Munchel* emphasized, conditions can be set to "disable the arrestee from executing that threat." *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021). His State probation conditions provide additional eyes, ears, and services to Matthew if he is released on the instant offense. A curfew, driving restrictions, location monitoring,

and travel restrictions will prevent him from additional driving infractions.

His Grandfather will prove to be a necessary and strategic relationship that will meet the requirements of the BRA and potentially enrich Matthew as he navigates growth from adolescence to adulthood.  Matthew wants his grandfather to be his Third-Party custodian.  He intends to go live with his grandfather pending these charges and continue to address his case.  His grandfather is retired, he lives alone, and he can provide supervision of Matthew.  He was a Marine and he is a Vietnam Veteran.  In civilian life he worked as a plumber.  He is proud of being 27 years sober.  He was a very active member of AA for many years.  His lived experience and positive outlook toward treatment and recovery can be encouraging to Matthew to do the same if needed.  His grandfather is equipped with vast life experience to demonstrate sobriety to his grandson and offer support where needed.  He is aware of Matthew's charges, his criminal history, and he wants to be supportive to his grandson at this critical stage in his life.  His grandfather does not have any firearms in his home.  He has a landline and he is disconnected from the internet.  He is willing to have Matthew on GPS monitoring.

Matthew's parents also remain supportive of him.  They are also willing to be his Third-Party custodian.  Given the weapons that were in their home and the government's intimation that his father would not be the best custodian at this time, we arranged release to his grandfather.  His parents, particularly his mother, can always be a back-up and she is willing to help him meet the court's conditions.  Matthew has a good supportive network of family.  Between his parents, grandfather, younger brother, and aunt he will be encouraged to work hard, achieve his goals, attend treatment, and complete probation.  At the time of these allegations, Matthew was in full compliance with his bail requirements.  Despite what the news and social media say, Matthew had every right to go to Washington, D.C. on January 6, 2021.  His condition preventing him from leaving the county

was imposed as part of his credit for time served probation sentence.  That condition was not issued until August 2021…more than eight months after Matthew lawfully travelled to Washington, D.C. *See* Exhibit 3.

The allegations arising out of January 6, 2021 was aberrant behavior stoked by red hot political rhetoric. Americans were encouraged to go to the Capitol building by people powerful positions.  It is unlikely such activity will happen again anytime soon.  Conditions that include: (1) no travel, (2) no use of social media, (3) GPS monitoring, (5) living with his grandfather or parents, and (6) participation in the High Intensity Supervision Program, will assure the Court that Matthew will continue to be the non-risk he was for the 13 months before his arrest in this case.

If the court permits him to work, undersigned counsel has confirmed with his former employer that he is welcome to return to work upon release.  They wrote a supportive letter for his release. Exhibit 5. He worked for a junk removal company that primarily serves their commercial customers and apartment complexes.  Matthew was part of a team of two (they always work in pairs). Due to the pandemic, and limited employees, his two-person team was sidelined.  His employer is excited by the opportunity to have Matthew back and reinstate his team to their fleet.

> ii. **Pre-trial Detention, more than 5 hours from appointed counsel undermines the level of effective assistance of counsel Matthew is Constitutionally owed.**

Pre-trial detention is a barrier to being able to utilize affective assistance of counsel by having limited attorney visits, often remote, and the inability to properly view volumes of discovery and discuss it with counsel.  There is so much speculation about what and how Matthew thinks. The easiest potential solution is getting a professional perspective through pre-trial evaluation.  Pre-trial mental health evaluations while in custody are hard to come by in a timely manner.  Substance abuse evaluations are even more scarce pre-trial.  Evaluations while incarcerated also greatly reduce his confidentiality.  Access to counsel amidst a global pandemic is a serious and legitimate

consideration that favors release.

**VII.    <u>CONCLUSION</u>**

For the above reasons and the arguments anticipated at the preliminary and detention hearing, Matthew Beddingfield respectfully requests that this Court revoke the order of detention in this matter and release him on Intensive Supervised Release conditions.  This court has released similarly situated January 6th defendants whom were known members of extremist groups.  This court has also released adults who engaged in violence against law enforcement that day who arrived with weapons like guns, chemical sprays, concealed knives, and Tasers.  Matthew Beddingfield's conduct should not be overstated and his perceived dangerousness can't be linked to unconstitutional notions that his speech will result in future violent acts.  He understands the gravity of this moment.  With his family support and pre-trial services he will comply with this court's order.

Respectfully submitted this 3rd  day of March, 2022.

FEDERAL PUBLIC DEFENDER OF
EDNC RALEIGH

By:     ***/s/ Kyana Givens***
KYANA GIVENS
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina  27601
Telephone:  919-856-4236
Fax:  919-856-4477
E-mail:  Kyana_Givens@fd.org
Washington Bar No. 37670
LR 57.1 Counsel Appointed

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served upon:

SEAN P. MURPHY
Assistant United States Attorney
Detailee, Capitol Siege Section
District of Puerto Rico
Torre Chardón, Suite 1201
350 Carlos Chardón Avenue
San Juan, PR 00918


by electronically filing the foregoing with the Clerk of Court on March 3, 2022, using the CM/ECF

system which will send notification of such filing to the above.

This the 3rd day of March, 2022.

/s/ Kyana Givens
KYANA GIVENS
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Kyana_Givens@fd.org
Washington State Bar No. 37670
LR 57.1 Counsel, Appointed

---

[1] *See also United States v. Gina Bisignano*, 21-CR-036 (CJN) (alleged to be a "leader" of the insurrection and allegedly exclaimed, "We need weapons!" while pushing against the police line); *United States v. Christopher Alberts*, 1:21-cr-026 (CRC) (found carrying a fully loaded handgun and a bullet-proof vest).